## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA
## FORT PIERCE DIVISION

### Civil Action No. 2:18-CV-14371-ROSENBERG/MAYNARD

ELLEN BERMAN, and DAYANA
GUACH on behalf of themselves and all
others similarly situated,

Plaintiffs,

         v.

GENERAL MOTORS LLC, a Delaware
limited liability company

Defendant.

_____

## FINAL APPROVAL ORDER AND JUDGMENT

The Court having held a Final Approval Hearing on October 3, 2019 ("Final Approval Hearing"), notice of the Final Approval Hearing having been duly given in accordance with this Court's Order: (1) Conditionally Certifying a Settlement Class, (2) Preliminarily Approving Class Action Settlement, (3) Approving Notice Plan, and (4) Setting Final Approval Hearing (ECF 29) ("Preliminary Approval Order"), and having considered all matters submitted at the Final Approval Hearing and otherwise, and finding no just reason for delay and good cause appearing therefore, I hereby grant Plaintiffs' Motion for Final Approval of Class Action Settlement (ECF 120), and Plaintiffs' Unopposed Motion for Attorneys' Fees and Expenses and Class Representative Service Payments (ECF 121), and direct the Clerk to enter final judgment dismissing this action as further set forth below.

## I.      RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

As discussed in the Parties' briefing[1] and at the October 3, 2019, Final Approval Hearing in this action, Plaintiffs claim that Class Vehicles (*i.e.* 2010, 2011, 2012 and 2013 Chevrolet Equinox and GMC Terrain vehicles equipped with 2.4-liter Ecotec engines) contain certain defective piston rings in their engines that are prone to premature wear and excessive engine oil consumption.  In certain cases, the defective piston rings may also cause damage to the vehicle's engine components, requiring repair and/or replacement of those components. (ECF 1, Complaint).[2]

GM has denied these allegations, but nonetheless claimed to the extent there is an issue, it was addressed by the issuance of Special Coverage Adjustments ("SCA") for the 2010-2012 model years, and a design change in May 2013.  For model year 2010-2012 Class Vehicles, GM's previously issued SCAs provided free piston assembly replacement for vehicles diagnosed with high oil consumption within specified time and mileage limitations, and also allowed then current owners to submit reimbursement claims for out-of-pocket costs.  ECF 27-1, at  2-3, Exs. D, E & F.  The deadlines to submit expense reimbursement claims under the three SCAs for the 2010-

---

[1]  The Court incorporates by reference the facts set forth in Plaintiff's Motion for Preliminary Approval (ECF 27), Plaintiffs' Motion for Final Approval (ECF 120), Plaintiffs' Unopposed Motion for Attorneys' Fees and Expenses, and Class Representative Service Payments (ECF 121), Defendants' Memorandum in Support of Motion for Final Approval (ECF 149), and Plaintiffs' Response to Objections to Class Action Settlement (ECF 148).

[2]  On September 10, 2018, Plaintiff filed her Class Action Complaint alleging that certain Class Vehicles contain defective piston rings in their Ecotec 2.4L engines that are prone to premature wear.  Plaintiff alleged claims for breach of express and implied warranty, and violation of Florida's Unfair & Deceptive Trade Practices Act. In addition to the instant action, related class actions were previously filed by the undersigned proposed Class Counsel against GM in the United States District Court for the Northern District of California (*Hindsman v. General Motors LLC*, No. 17-cv-5337 ("*Hindsman*")) on September 14, 2017, and in the United States District Court for the Northern District of Illinois (*Sanchez v. General Motors LLC*, No. 18-cv-02536 ("*Sanchez*")) on April 19, 2018.  The related class actions involve the same alleged defect as in this Action.

2012 Class Vehicles expired years ago. ECF 27-1, at  118, 127, & 137. Prior to the Settlement in

this action, GM had not issued an SCA for the 2013 model year Class Vehicles.

## II.     SUMMARY OF SETTLEMENT TERMS

The Settlement Agreement, including its exhibits ("Settlement Agreement") (ECF 27-1),

and the definition of words and terms contained therein, are incorporated by reference in this

Order. The terms of this Court's Preliminary Approval Order (ECF 29) are also incorporated by

reference in this Order. In the Settlement Agreement, the Settlement Class is defined as follows:

> All persons within the United States who purchased or leased, at any
> time before the Preliminary Approval Date, a new retail or used
> model year 2010, 2011, 2012, or 2013 Chevrolet Equinox or GMC
> Terrain vehicle equipped with 2.4 liter Ecotec engines,
> manufactured prior to the Production Change, and who have not
> executed a prior release of claims related to Class Vehicle oil
> consumption or resulting piston or engine damage in favor of GM.

Excluded from the Class Vehicles, for avoidance of doubt, are all model year 2013 Equinox

and Terrain vehicles that GM manufactured after the Production Change.  Also excluded from the

Settlement Class are (a) insurers of members of the Settlement Class; (b) any entity purporting to

be a subrogee of a member of the Settlement Class; (c) all suppliers, manufacturers, distributors,

shippers, and third-party issuers or providers of extended warranties or service contracts for GM's

Class Vehicles; (d) individuals who previously settled and released claims against GM with respect

to their Class Vehicles; and (e) the judge overseeing the proposed settlement and the judge's

immediate family.

As described in detail in Plaintiffs' Motion for Final Approval of Class Action Settlement

(ECF 120), and also addressed at the Final Approval Hearing, the Settlement Agreement contains

the following relief for the Settlement Class:

1.      ***2010-2012 Model Class Vehicles.*** Individuals with Class Vehicles that were subject to the previously issued 2010-2012 SCAs would be (i) provided direct notice of the SCAs via the Class Notice[3]; (ii) provided with a Claim Form directly, via First Class U.S. Mail, in another classwide mailing after the Effective Date (*e.g.* an order granting Final Approval of the Settlement) (ECF 27-1, ¶ 14); and (iii) afforded a new opportunity to submit a claim for reimbursement for expenses previously incurred (subject to the SCA time and mileage limitations) for items such as replacement of piston assemblies for excessive oil consumption and related vehicle rental charges (*i.e.*, claims that they may not have submitted previously and/or that may have occurred after the claim submission deadlines of the SCAs). (Settlement Agreement, ECF 27-1 ¶ 46.a. and 46.b). With this relief, despite prior expiration of the deadlines to submit a claim for reimbursement, Class Members who are or were owners of the 2010-2012 Model Class Vehicles, and who did not previously submit a reimbursement claim, will be granted a new opportunity to do so.  In addition, those who purchased a 2010-2012 Class Vehicle before or after the initial notice of these SCAs (which were mailed only to then current owners or lessees) and may not have known about their eligibility, were provided direct mail notice and a new opportunity to seek and obtain reimbursement.  These individuals are thus able to make a reimbursement claim prior to the Claim Deadline (120 days after the Effective Date of the Settlement).  There is no cap on the amount of expenses a Class Member may claim for piston assembly replacement and rental car expenses. Pursuant to the SCAs, the time and mileage limitations for the 2010 Class Vehicles are ten (10)

---

[3] This Class Notice was sent to more than one million model year 2010-12 Class Members, which gave these individuals additional opportunity to learn of or review the SCA and to submit a claim. Importantly, the notice was directly disseminated to not only the original owners, but also to every owner of the Class Vehicles in the chain of title up to and including current owners, which includes an additional approximate 568,623 persons who did not receive notice of the SCAs when the SCAs were originally issued.  ECF 149, Declaration of Richard W. Simmons, at Exh. 2.

years or 120,000 miles, after initial retail sale or lease, whichever comes first; and the time and mileage limitations for the 2011 and 2012 Class Vehicles are seven (7) years and six (6) months, or 120,000 miles, after initial retail sale or lease, whichever comes first.

2.    ***2013 Model Class Vehicles***.  Pursuant to the Settlement Agreement, GM will issue a new SCA for 2013 Class Vehicles manufactured prior to the Production Change within thirty (30) days of the Effective Date of the Settlement.  Under this SCA, Class members may present their Class Vehicles to authorized GM dealerships for free diagnosis and, if diagnosed as currently consuming excessive oil, receive free piston assembly replacement, subject to express terms, conditions and time and mileage limits of the New SCA (seven (7) years and six (6) months, or 120,000 miles, whichever comes first, after each Class Vehicle's initial new retail sale or lease). In addition, Settlement Class Members who previously paid out-of-pocket for piston assembly replacement due to excessive oil consumption, or other repairs solely required and caused by excessive oil consumption due to piston ring wear, may file claims for reimbursement of such expenses, including those incurred for car rental while repairs were being performed.  *Id.* ¶¶ 46.c. and 46.d.  There is no cap on the amount of expenses a Class Member may claim for piston assembly replacement, other repairs solely caused by excessive oil consumption and rental car expenses.  Pursuant to the Settlement Agreement, each Class Member subject to the 2013 SCA would be issued direct notice, *via* First Class U.S. Mail, of their rights and obligations under the Settlement.

3.    ***Notice and Claim Forms***.  Pursuant to the Settlement Agreement, the Notice and Claim Forms will be disseminated to all Class Members, informing them of the Settlement approval and providing them with a Claim Form to submit reimbursement for the aforementioned expenses.  As discussed at the Final Approval Hearing, the Notice and Claim Forms, attached

herein as Exhibit A (Second Notice and Claim form for 2010 Model Class Vehicles); Exhibit B (Second Notice and Claim form for 2011-2012 Model Class Vehicles); and Exhibit C (Second Notice and Claim form for 2013 Model Class Vehicles) will include clarifying language that the Settlement includes (as it always has) reimbursement for repairs and/or replacement of engine components that are or were required and solely caused by excessive oil consumption due to piston ring wear. Separate Notice and Claim Forms will be sent to the approximate 1,709 individuals who opted-out of the Settlement calling their attention to the clarifying language, so that they may have another opportunity to participate in the Settlement, or to continue to opt-out of the Settlement, attached hereto as Exhibit D (Separate Notice and Claim Form to Opt-Outs for 2010-2012 Model Class Vehicles), and Exhibit E (Separate Notice and Claim Form to Opt-Outs for 2013 Model Class Vehicles). The cost to GM of this additional notice, which includes the approximate 1,709 opt-outs, and more than one-million Class Members subject to the 2010-2013 SCAs (including the additional approximately 568,623 people who never received notice of the 2010-2012 SCAs, and the approximate 270,000 Class Members subject to the new 2013 SCA) is approximately $1.3 million.[4]

4.     ***Notice and Class Members' Dispute Resolution Process.***

The Court hereby finds and concludes that Class Notice was disseminated to members of the Settlement Class in accordance with the terms set forth in the Settlement Agreement and that Settlement Class Notice and its dissemination were in compliance with this Court's Preliminary Approval Order, and satisfies due process. The Court further finds that the additional Class Notice

---

[4]    Including the expenses associated with the initial notice of preliminary approval of the Settlement previously sent to putative class members, the total estimated Notice and Administration Cost is $2,397,392.24. (ECF 120-7, Declaration of Richard W. Simmons ¶ 19).

described herein, and in the Settlement Agreement, is reasonably calculated to inform Class Members of their rights.

Each Class Member may submit a Claim Form, which will be reviewed by the Settlement Administrator.  As addressed in paragraphs 61-63 of the Settlement Agreement (ECF 27-1), in the event the Settlement Administrator rejects a Claim Form, the Settlement Administrator shall notify the Class member, along with Class Counsel and Defense Counsel.  In the event the Class Member contests the rejection, as set forth in the Settlement Agreement, Class Counsel and Defense Counsel shall meet and confer regarding a resolution of such rejection.  If the parties cannot agree on a resolution, the disputed Claim Form shall be presented to the Court and/or a referee appointed by the Court for final resolution.  This is a fair process for the Class Members.

5.    *The Release*.  The Release here is limited to claims "that were brought or could have been brought based on the facts alleged in the Action and Related Actions that relate in any manner to claims of excessive oil consumption or *resulting* piston or engine damage in Class Vehicles as alleged in the Action and the Related Action." ECF 27-1 ¶ 70 (emphasis added). Engine damage claims unrelated to oil consumption issues are not released. Moreover, only those persons who are identified by GM on the Class List (and thus are mailed a Class Notice *via* First Class US Mail), and who do not opt out of the Settlement, release their claims. *Id.* ¶¶ 9, 11, 52.a. and 70.

## III.    ANALYSIS OF THE FAIRNESS, ADEQUACY AND REASONABLENESS OF THE PROPOSED SETTLEMENT

Judicial and public policy favor the voluntary settlement of class litigation.  *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the pretrial settlement of class action lawsuits"); *Warren v. City of Tampa*, 693 F.Supp. 1051, 1054 (M.D. Fla. 1988) ("settlements are highly favored in the law"); *In re Sunbeam Sec. Litig.*, 176 F. Supp.2d

1323, 1329 (S.D. Fla. 2001) (citation omitted) (the Court "should always review the proposed settlement in light of the strong judicial policy that favors settlements."). Thus, "there exists 'an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being [the] most complex.'" *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1314 (S.D. Fla. 2005) (internal citations omitted).  With a settlement, class members are ensured a benefit as opposed to "the mere possibility of recovery at some indefinite time in the future." *In re Domestic Air Transport. Antitrust Litig.*, 148 F.R.D. 297, 306 (N.D. Ga. 1993).

A settlement should be approved if it is fair, reasonable, and adequate, and not the product of collusion.  *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). In determining whether a settlement is "fair, adequate, and reasonable," the following factors are generally considered:

> (1) the existence of fraud or collusion behind the Settlement; (2) the complexity, expense and duration of litigation; (3) the stage of proceedings at which the Settlement was achieved and the amount of discovery completed; (4) the probability of the Plaintiffs' success on the merits; (5) the range of possible recovery; and (6) the opinions of Class Counsel, Class Representatives, and the substance and amount of opposition received.

*Oakes v. Blue Cross & Blue Shield of Fla., Inc.*, 2016 U.S. Dist. LEXIS 147252, at *3 (S.D. Fla. Oct. 21, 2016), citing *Leverso v. SouthTrust Bank of AL., N.A.*, 18 F.3d 1527, 1530 n.6 (11th Cir. 1994*); see also Bennett*, 737 F.2d at 986. "In assessing these factors, the Court 'should be hesitant to substitute . . . her own judgment for that of counsel.'" *Lipuma*, 406 F. Supp. 2d at 1315 (quoting *In re Smith*, 926 F.2d 1027, 1028 (11th Cir. 1991)).

Ultimately, "[a] settlement is fair, reasonable and adequate when 'the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued.'" *In re Checking Acct. Overdraft Litig.*, 830 F.Supp.2d at 1344 (citation omitted).  That is the case here.

1.      **The Settlement is the Product of Informed Arm's-Length Negotiations**

A threshold consideration in determining whether to grant final approval of a class action settlement is whether a proposed settlement is the product of fraud or collusion between the parties. "In determining whether there was fraud or collusion, the Court examines whether the settlement was achieved in good faith through arm's-length negotiations, whether it was the product of collusion between the parties and/or their attorneys, and whether there was any evidence of unethical behavior or want of skill or lack of zeal on the part of class counsel." *Canupp v. Sheldon*, No. 04-cv-260, 2009 WL 4042928, at *9 (M.D. Fla. Nov. 23, 2009) (citing *Bennett*, 737 F.2d at 987, n.9.).

Here, no claim of fraud or collusion can be credibly made. The Settlement Agreement was only reached after briefing on a Motion to Dismiss in the California action, receipt of discovery from Defendant in that case, retention of knowledgeable and qualified experts, inspections of all Class Representative vehicles in the California and Illinois actions, and numerous conferences among adverse counsel. In addition, the Settlement was reached with the assistance of a neutral mediator with substantial experience mediating class actions, which further demonstrates the absence of collusion. *See Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) ("The fact that the entire mediation was conducted under the auspices of … a highly experienced mediator, lends further support to the absence of collusion."); *see also In re Checking Acct. Overdraft Litig.*, 830 F.Supp. 2d at 1345, 1349 (no collusion where settlement reached by capable and experienced counsel with the assistance of a well-qualified, experienced mediator).

A sole objector accused the Parties of collusion (ECF 80). However, other than dissatisfaction with the Settlement, the objector provided no evidence to support this allegation. Further, at the Final Approval Hearing, Michael Kirkpatrick, counsel for objectors Douglas

Reynolds Ghiselin, Tod Fitzpatrick and Leslie G Coulter, stated that "I never said there was any collusion, I don't doubt class counsel and Defense counsel's good faith, not at all." Final Approval Hearing Transcript at 58: 8.

Having read the Parties' briefing, and having heard the Parties' arguments at the Final Approval Hearing, the Court is satisfied that the Settlement Agreement is the product of arm's-length negotiation by experienced counsel, and is not the product of collusion.

### 2. The Complexity, Expense, and Duration of Litigation

Under this factor, the Court "consider[s] the vagaries of litigation and compare[s] the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *Lipuma*, 406 F.Supp. 2d at 1323. "The law favors compromises in large part because they are often a speedy and efficient resolution of long, complex, and expensive litigation." *Perez v. Asurion*, 501 F. Supp. 2d 1360, 1381 (S.D. Fla. 2007). If this case proceeded to trial, the Parties would incur significant expenses, consisting of the payment of expert witnesses and technical consultants, along with a substantial time commitment for the briefing of Plaintiffs' motion for class certification, *Daubert* motions, extensive trial preparation, trial attendance, post-trial motion practice, and appeal. "Complex litigation . . . can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive." *Lipuma*, 406 F.Supp. 2d at 1323, citing *Woodward v. Nor-Am Chem. Co.*, 1996 WL 1063670 *21 (S.D. Ala. 1996) (quoting *In re U.S. Oil & Gas Litig.*, 967 at 493). And, the outcome of litigation is uncertain, particularly in light of the dismissal of nearly all of the plaintiffs' claims in the parallel California action. "With the uncertainties inherent in pursuing a trial and appeal of this case, combined with the delays and

complexities presented by the nature of the case, the benefits of a resolution by way of settlement are apparent." *Lipuma*, 406 F.Supp. 2d at 1324.

### 3.      The Stage of Proceedings at which the Settlement was Achieved

The stage of the proceedings at which settlement is achieved is "evaluated to ensure that Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation." *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 694 (S.D. Fla. 2014) (quoting *Lipuma,* 406 F.Supp.2d at 1324).

While the Settlement occurred after the Parties engaged in discovery and investigation, that it happened prior to class certification is of no moment as early settlements are encouraged. *Oakes*, 2016 U.S. Dist LEXIS 147252 at *5-6, quoting *Ressler v. Jacobson*, 822 F. Supp. 1551, 1555 (M.D. Fla. 1992) ("The law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations."); *Lipuma*, 406 F. Supp. 2d at 1324 (citation omitted) ("'Early settlements benefit everyone involved in the process and everything that can be done to encourage such settlements—especially in complex class action cases—should be done.'").  Further, the Settlement was not achieved so early in litigation to prevent Class Counsel from having sufficient information to engage in arms-length negotiations.

Here, the record was sufficiently developed to enable Class Counsel to make a reasoned and informed judgment regarding the Settlement.  The Settlement was reached after Class Counsel obtained necessary discovery from GM and the California court's ruling on GM's motion to dismiss, which enabled Class Counsel to properly evaluate the merits of the case. Further, the Settlement here was informed by expert analysis and inspections of several Class Vehicles, and by numerous, ongoing discussions with the mediator regarding each party's factual and legal theories.

### 4.    The Probability of the Plaintiffs' Success on The Merits

"The likelihood of success on the merits is weighed against the amount and form or relief contained in the settlement." *Lipuma*, 406 F.Supp. 2d at 1319.  Where success at trial is uncertain, this factor weights in favor of approving the settlement.  *Newman v. Sun Capital, Inc.*, No. 09-cv-445, 2012 WL 3715150, at *11 (M.D. Fla. Aug. 28, 2012).  As addressed in the Parties' briefing, and at the Final Approval Hearing, in the related California action, GM moved to dismiss the plaintiffs' first amended complaint, and the court granted the motion in part and denied it in part, leaving only plaintiffs' breach of warranty claim based solely on the prior SCAs.  If the Parties had not negotiated the Settlement resolving the claims of all three cases, GM planned to file motions to dismiss in both the Illinois and Florida actions.  GM planned to assert several defenses to plaintiffs' claims, including defenses relating statutes of limitations and causation, both of which could be problematic given the age of these vehicles. Further, GM planned to argue various defenses as to the cause of the Oil Consumption Defect, which included a myriad of individual issues that would make class certification more challenging.

Given the countless risks attending ongoing litigation, as well as the likelihood of significant delay and expense of ongoing litigation for cars that are already six (6) to nine (9) years old, the Settlement represents a fair compromise.

### 5.    The Range of Possible Recovery and the Point on or Below the Range of Recovery at Which a Settlement is Fair.

"The range of possible recovery spans from a finding of non-liability to a varying range of monetary and injunctive relief.  In considering the question of a possible recovery, the focus is on the possible recovery at trial." *Saccoccio*, 297 F.R.D. at 693 (citation and internal quotation marks omitted).  However, "[m]onetary relief is difficult to quantify." *Lipuma*, 406 F.Supp.2d at 1322.  Thus, in evaluating a class settlement, "the Court's role is not to engage in a claim-by-claim, dollar-

12

by-dollar evaluation, but rather, to evaluate the proposed settlement in its totality." *Id*. at 1323. "A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery." *Mahoney v. TT of Pine Ridge, Inc.*, No. 17-80029-CIV, 2017 WL 9472860, at *5 (S.D. Fla. Nov. 20, 2017) (quoting *Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 521 (S.D. Fla. 1988).

Here, given the risks associated with continued litigation, the range of recovery is zero through varying levels of monetary and injunctive relief. The immediate and substantial financial relief secured for the Settlement Class provides the Class with the precise relief the litigation was brought to obtain: the right to file claims for reimbursement for the repair of the defect in question through the 2010-2012 SCAs (the claim filing deadline for which is extended under the Settlement Agreement) and the 2013 SCA (which is entirely new as a result of the Settlement Agreement).

Several objectors challenge the adequacy of Settlement relief based on the incorrect assumption that the relief afforded to current and former owners of 2010-12 Class Vehicles is identical to GM's previously issued SCAs, and thereby provides no value. These objections have been considered and are overruled. As addressed in the briefing and arguments before the Court, the reimbursement claims deadlines of the 2010-2012 SCAs expired years ago and, but for approval of the Settlement, Class Members could no longer make claims. Pursuant to the Settlement Agreement, the owners will have a new opportunity to make reimbursement claims under the 2010-2012 SCA for a period of 120 days after the Effective Date of the Settlement. Further, the Settlement clarifies entitlement of Class Members to reimbursement of related rental car expenses. In addition, GM sent out a new, direct-mail notice to more than one-million Class Members, which gave these individuals an additional opportunity to learn of or review the SCA, and to submit a claim. This is also significant because the original SCA notices for the 2010-2012

vehicles were mailed only to then current owners, and the new notice was sent to every consumer in the chain of title, which includes an additional approximately 568,623 people who never received direct mail notice of the 2010-2012 SCAs and who now have an opportunity to submit a claim.

Several objectors also challenge the adequacy of Settlement relief based on the incorrect assumption that the relief afforded to current and former owners of 2013 Class Vehicles has no value because no data was provided to estimate the value. However, briefing and evidence before the Court confirms the value of the 2013 SCA is estimated to be at least forty million dollars ($40,000,000). Plaintiffs' expert, Lee Hurley, an automotive expert with more than forty (40) years of relevant experience, confirmed that a conservative estimate for the Piston Ring assembly fix, alone, was at least $2,000, not including labor or rental car expenses, for each of the roughly 270,000 vehicles subject to the 2013 SCA.  (*See Hurley Decl.,* ECF 120-4, ¶¶ 2, 6)[5].  Further, a declaration from Alfred Schankin, GM's Safety and Field Investigation Engineer, described GM's standard business practice of calculating projected costs of SCAs, and confirmed that the value of the 2013 SCA is at least $40 million.  (*See generally Schankin Decl.,* ECF 149-3).  In addition, although the Parties have each estimated the value of the 2013 SCA at $40 million, there is no cap on the funds available to Class Members; thus, the value of the fund could exceed $40 million, and each Class Member's recovery would not have to be reduced pro rata (or otherwise), as often required by those settlements with a capped total fund.  GM is obligated to pay the full value of every single claim that falls within the parameters of the Settlement Agreement.

---

[5] GM anticipates an approximate 7.34% participation rate under the 2013 SCA.  $2,000 multiplied by 19,710 (7.34% of 270,000) is roughly $40 million.

Moreover, the 2013 SCA is entirely new and is a result of the Settlement.  As with the 2010-2012 SCAs, the 2013 SCA confers a substantial benefit in that Class Members will be notified directly of their eligibility for free repairs and the opportunity to file claims for reimbursement of out-of-pocket costs incurred.  At the Final Approval Hearing, Class Counsel and GM's counsel confirmed that the 2013 SCA was vigorously negotiated as part of the Settlement, and that GM had not decided to issue an SCA for the 2013 Class Vehicles prior to the filing of this Class Action and settlement discussions.  Final Approval Hearing Transcript 42-43.

Several objectors also complain in conclusory fashion that the Settlement was unfair or unreasonable because it did not compensate them for all costs related to the alleged defect, including, among other items, reimbursement for engine repair or replacement, diminution in value at resale, and routine maintenance and repairs (such as oil changes).  These objections have been considered and are overruled.  As addressed by both Class Counsel and GM's counsel at the Final Approval Hearing, the SCAs for the 2010-2013 Class Vehicles have always contemplated repair or replacement of engine components that have failed solely as a result of excessive oil consumption due to piston ring wear.  As explained at the Final Approval Hearing, under the Settlement Agreement, Class Members could be reimbursed as much or more than $6,000 if they required repair or replacement of engine components solely caused by excessive oil consumption due to piston ring wear.  The Notice and Claim Forms that will be sent out following this Final Approval Order will include clarifying language that the Settlement includes (as it always has) this relief.  Separate Notice and Claim Forms will also be sent to the approximately 1,709 Class Members who previously opted-out of the Settlement calling their attention to the clarifying language, so that they may have another opportunity to participate in the Settlement, or to continue to opt-out of the Settlement.  Therefore, objections that the Settlement Agreement does not cover

reimbursement for related engine repair or replacement are based on a misunderstanding of the Settlement Agreement, which has now been clarified.

Objectors' complaints that the Settlement does not compensate Class Members for diminished resale value of the vehicles does not impact the Court's finding that the Settlement should be approved.[6]   Likewise, objections that the Settlement does not compensate Class Members for items such as routine maintenance or repairs (which are part and parcel of a vehicle ownership generally) does not impact this Court's finding that the Settlement should be approved. Settlements are not evaluated on whether they provide "the best possible deal" or whether the result is equivalent to a "victory at trial." *In re Checking Account Overdraft Litig.*, No. 09-MD-02036, 2015 WL 12641970, at *8 (S.D. Fla. May 22, 2015) (quotations marks and citation omitted).   Rather, settlements are evaluated by whether the results are fair, reasonable and adequate.   In making this evaluation, the Court is guided by the important maxim "that the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate." *Morgan v. Pub. Storage*, 301 F. Supp. 3d 1237, 1250 (S.D. Fla. 2016).   However, as discussed herein, this Settlement amounts to more than just a fraction of the potential recovery a class member may receive.

---

[6] Courts have rejected abstract claims for diminution-in-value damage absent allegations of actual or attempted sale at a diminished price. *See Briehl v. General Motors Corp.*, 172 F.3d 623, 628-29 (8th Cir. 1999) (claims for diminished value of vehicle because of alleged brake defect were "too speculative"). More recently, in *In re Nissan Radiator/Transmission Cooler Litig.*, No. 10 CV 7493 VB, 2013 WL 4080946 at *14-15 (S.D.N.Y. May 30, 2013), the court overruled similar objectors' challenges to a class settlement based on the contention that they should be entitled to diminished value of their vehicles. The court explained that claims for "diminished value" present challenges because proving them required individualized inquiry into the details of negotiated sales demonstrating the diminished value of Class Vehicles because of the alleged defect. In overruling the objections, the court stated "[g]iven the inherent difficulty in valuing and proving these claims, [it] cannot say that the bargained for settlement agreement, which provides tangible benefits to the Class Members beyond the original and extended warranties offered by Nissan, is unfair." *Id.* at *14.

Several objectors also criticize the time and mileage limits of the SCAs.  However, these objections overlook the fact that the Settlement provides Class Members an opportunity to submit requests for reimbursement of out-of-pocket expenses incurred in relation to the repairs of the alleged defect, *even if* Class Vehicles are now outside the applicable time and mileage restrictions, and *even if* the deadlines to submit claims under the SCAs expired years ago, so long as the repairs and expenses were incurred *during* the applicable time and mileage limitations of the SCAs (e.g. a covered repair expense that occurred in 2016 when the vehicle had 105,000 miles on the odometer is now potentially reimbursable).

Further, the reasonableness of the time and mileage restrictions under the SCAs is confirmed by the approval that district courts have given substantially similar automotive class action settlements that imposed comparable restrictions.  For example, in *Collado v. Toyota Motor Sales, U.S.A., Inc.*, No. CV-10-3124-R, 2011 WL 5506080, at *2 (C.D. Cal. Oct. 17, 2011), the district court rejected objections that the settlement's 5-year/50,000 mile time and mileage restrictions were unfair, stating that "there has to be some reasonable limit to the warranty period, as any longer warranty period would defeat the purpose of a limited warranty." *See also, e.g. In re Nissan Radiator/Transmission Cooler Litig.*, No. 10 CV 7493 VB, 2013 WL 4080946, at *11 (S.D.N.Y. May 30, 2013) (objections to the 10 year/100,000 mile cut-off was "not a basis for finding the settlement is unfair or unreasonable"); *Milligan v. Toyota*, No. 3:09-cv-05418-RS, slip op. at 12 (N.D. Cal. Jan. 6, 2012) (rejecting objections to a class action settlement with time and mileage restrictions of 10 years and 150,000 miles).  The rationale of the foregoing cases applies

directly here: there must be reasonable limits in any settlement, and those will vary from case to case.[7]

To the extent a Class Member's claim falls outside of the time and mileage cut-off, they were free to opt out of the Settlement and pursue claims against GM in separate actions.  *See Diaz v. HSBC USA, N.A.*, No. 13-21104, 2014 WL 5488161, at *3 (S.D. Fla. Oct. 29, 2014); *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1241-42 (11th Cir. 2012) (objections that "the settlement is unreasonable because it strips class members of their class rights while failing to resolve their individual claims" and "that the settlement does not adequately compensate them" deemed "unconvincing" since class members were "free to opt out of the class and still have the option of . . . filing an individual suit").

Considering the range of zero to at least $2,000 per Class Member (and potentially more than $6,000 per Class Member if they require covered repair or replacement of engine components), the settlement amount is not unreasonably low in light of the risks inherent in litigation and the difficulties presented in this case.  Thus, the range of possible recovery supports a finding that the settlement is fair, reasonable, and adequate.

### 6.    The Substance and Amount of Opposition to the Settlement

Objections to class action settlements are an important part of the Rule 23 process.  In determining whether a class action settlement is fair, reasonable, and adequate, the Court must consider the reaction of absent class members.  *Bennett,* 737 F.2d at 986; *Hall v. Bank of Am., N.A.,* No. 12-22700, 2014 WL 7184039, at *5 (S.D. Fla. Dec. 17, 2014).  Here, direct mail notice

---

[7] As explained by Class Counsel at the Final Approval Hearing, each of the Class Vehicles was sold with a five (5) year, one-hundred-thousand (100,000) mile, whichever came first, warranty. Final Hearing Transcript, at 9.   All of the SCAs expand this coverage by several years and tens of thousands of miles.

was sent to 1,641,531 Class Members.  Of those 1,641,531 class members, 70 submitted objections, which represents .0043% of Class Members.  Further, to date, 1,709 Class Members have submitted valid opt-outs.  These "low opt-out and objection rates weighs in favor of granting final approval" of the Settlement.  *Burrow v. Forjas Taurus S.A.*, No. 16-21606-CIV, 2019 WL 4247284, at *10 (S.D. Fla. Sept. 6, 2019) (citing *Lipuma*, 406 F. Supp. 2d at 1324; *see also Saccoccio*, 297 F.R.D. at 694.  Further, no state or federal government officials filed objections, which also weighs in favor of granting final approval.

The Court has read and considered all written objections, and heard fully all arguments made on behalf of objectors Douglas Reynolds Ghiselin, Tod Fitzpatrick and Leslie G Coulter, presented by their counsel, Michael Kirkpatrick, at the Final Approval Hearing.  As described herein, these objections generally include, but are not limited to, the following issues (1) the propriety of the time and mileage limitations of the SCAs (2) whether the 2010-2012 SCAs have value/consideration for release of claims, (3) whether the 2013 SCA has value/consideration for the release of claims (4) whether the Settlement fairly compensates Class Members, (5) whether the Settlement is the product of collusion, (6) whether there was adequate assessment of the potential range of recovery; and (7) whether attorneys' fees are supported (discussed below)[8].

Each of these objections was addressed in detail by Class Counsel in their Response to Objections to the Class Settlement (ECF 148), and at the Final Approval Hearing.  The Court has fully and carefully reviewed these arguments and, for the reasons discussed herein, finds that they do not impact the Court's conclusion that the Settlement is fair, reasonable, and adequate, and that

---

[8] The Court has summarized and grouped the objections here for purposes of concision.  However, the Court has reviewed and heard each objection in detail and finds that they do not impact the Court's decision that the Settlement should be finally approved.

the Settlement should be granted final approval. The Court thus overrules the objections in their entirety.

## IV.    THE SETTLEMENT CLASS IS PROPERLY CERTIFIED.

The Court entered an Order finding Rule 23 certification appropriate for preliminary approval on May 2, 2018.  (ECF 29 ¶¶ 1 to 4.)  Based on the facts and argument stated herein and for the reasons set forth in the Memorandum in support of the Motion for Preliminary for Approval (ECF 27), and Plaintiffs' Motion for Final Approval of Class Action Settlement (ECF 120), class certification of the Settlement Class is well warranted here.  For the same reasons, also warranted are the designations of Class Counsel and the Plaintiffs as Class Representatives. (*Id.* ¶ 5.)

"Under Fed. R. Civ. P. 23 . . . [there are] four threshold requirements of Rule 23(a): (1) the class must be so numerous that joinder of all members is impracticable ('numerosity'); (2) questions of law or fact common to the class must exist ('commonality'); (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class ('typicality'); and (4) the representative parties must fairly and adequately protect the interests of the class ('adequacy of representation')." *Leszczynski v. Allianz Ins*., 176 F.R.D. 659, 668 (S.D. Fla. 1997). Also, the movant must show that the case can proceed as a class action under subparts (1), (2), and/or (3) of Rule 23(b).  *Fabricant v. Sears Roebuck & Co*., 202 F.R.D. 310, 313 (S.D. Fla. 2001).  As set forth below, each the Rule 23(a) and Rule 23(b) requirements are satisfied here.

### A.    The Rule 23(a) Requirements are Satisfied

#### 1.    The Class is so numerous that joinder is impracticable

The first prerequisite to class certification is that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1). No specific number is required to satisfy

numerosity.  However, fewer than twenty-one members is generally inadequate.  *See, e.g., Jones v. Firestone Tire & Rubber Co., Inc.*, 977 F.2d 527, 534 (11th Cir. 1992) (citations omitted).  Here, the Court finds that the Settlement Class of 1.641 million persons makes joinder of all such persons impracticable, and the numerosity requirement is thus satisfied.

### 2.      There are questions of law and fact common to the Class

The second prerequisite to class certification is that "there are questions of law or fact common to the class."  Fed. R. Civ. P. Rule 23(a)(2) (emphasis added).  The "threshold of commonality is not high."  *Campos v. INS*, 188 F.R.D. 656, 659 (S.D. Fla. 1999) (citation omitted).  The "Plaintiffs' legal claims need not be completely identical" to every Class Member.  *Brown v. SCI Funeral Servs. Of Fla., Inc.,* 212 F.R.D. 602, 604 (S.D. Fla. 2003) (citations omitted).  "[F]actual differences concerning treatment [by Defendant] or damages will not defeat a finding of commonality."  *Id.*

Here, Plaintiffs' allegations arise from the same common nucleus of operative facts, and all members of the proposed Settlement Class will rely upon the same common evidence to prove their claims.  The common issues include: whether the Class Vehicles contain common defective parts, whether GM breached its uniform implied and express warranties by selling defective Class Vehicles, and whether GM's breach of warranties caused consumers to suffer harm.  The commonality requirement is thus satisfied.

### 3.      Plaintiffs' claims are typical of the claims of the Class.

The third prerequisite to class certification is the typicality requirement.  Fed. R. Civ. P. 23(a)(3). To satisfy the typicality requirement, "[c]lass members' claims need not be identical . . . rather, there need only exist a sufficient nexus between the legal claims of the named class

representatives and those of individual class members to warrant class certification." *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1216 (11th Cir. 2012) (internal citations omitted).

Plaintiffs' claims arise from the same common defective piston rings at issue in the Class Vehicles' engines, and from the same legal theories as the Settlement Class Members' claims. Although Plaintiffs may own a different model of Class Vehicle than other Settlement Class Members, all of the models of Class Vehicles contain similar allegedly defective parts. Therefore, the Court finds Plaintiffs and Settlement Class Members have an identical interest in recovering their alleged losses sustained as a result of the same course of conduct.  The typicality requirement is thus satisfied.

### 4.    Plaintiffs will fairly and adequately represent the Settlement Class.

The fourth and final prerequisite under Rule 23(a) is the "adequacy of representation" requirement.  Fed. R. Civ. P.23(a)(4).  The inquiry under Rule 23(a)(4) has two components: (1) "the representatives must not possess interests which are antagonistic to the interests of the class"; and (2) "the representatives' counsel must be qualified, experienced and generally able to conduct the proposed litigation."  *CV Reit, Inc. v. Levy*, 144 F.R.D. 690, 698 (S.D. Fla. 1992) (citation omitted).  Adequacy of representation is usually presumed in the absence of evidence to the contrary.  *Access Now, Inc. v. AHM CGH, Inc.*, No. 983004, 2000 WL 1809979, at *4 (S.D. Fla. 2000) (citation omitted).

Here, the proposed Class Representatives in this Action and the Related Actions purchased Class Vehicles containing allegedly defective parts and thus allegedly suffered injury or loss. None of the proposed Class Representatives has any interest that is antagonistic to the claims of any Settlement Class Member, and the proposed Class Representatives' interests are aligned with the interests of Settlement Class Members. Likewise, Class Counsel have vigorously represented

the Proposed Class Representatives and putative Class Members in this Action and the Related

Actions. Therefore, the Court finds adequacy is met for both the Class Representatives and Class

Counsel.

**B.**    **The Requirements of Rule 23(b)(3) are Satisfied**

In addition to meeting the requirements of Rule 23(a), the movant must show that the case

can proceed as a class action under subparts (1), (2), and/or (3) of Rule 23(b).  *Fabricant,* 202

F.R.D. at 313 (citation omitted).   The Settlement here entails certification under Rule 23(b)(3),

which requires: (1) that common questions predominate over individual questions; and (2) that a

class action is a superior procedural vehicle rather than separate individual cases.

**1.    Common Questions Predominate**

The predominance requirement of Rule 23(b)(3) requires that "[c]ommon issues of fact and

law . . . ha[ve] a direct impact on every class member's effort to establish liability that is more

substantial than the impact of the individualized issues in resolving the claim or claims of each

class member."  *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.,* 601

F.3d 1159, 1170 (11th Cir. 2010) (internal quotation marks omitted).   The predominance

requirement "does not require that all issues be common to all parties, rather it mandates that

resolution of the common questions affect all or a substantial number of the class members."  *In*

*re Tri-State Crematory Litig.*, 215 F.R.D. 660, 692 (N.D. Ga. 2003) (citation omitted).

Moreover, the fact that this matter involves state laws from multiple jurisdictions does not

undermine certification of the Settlement Class.  *Sullivan v. DB Investments, Inc.,* 667 F.3d 273,

303 (3rd Cir. 2011) (*en banc*) ("'variations [in state laws] are irrelevant to certification of a

settlement class' since a settlement would eliminate the principal burden of establishing the

elements of liability under disparate laws."); *Burrow v. Forjas Taurus S.A.,* 2019 U.S. Dist. LEXIS

63893, *22-23 (S.D. Fla. Mar. 15, 2019) ("choice-of-law analyses may have presented manageability problems in resolving claims in contested class and litigation proceedings, [but] it is not a factor in the nationwide settlement context").

The predominance requirement is satisfied because questions common to all Settlement Class Members substantially outweigh any possible issues that are individual to each Settlement Class Member. The salient evidence necessary to establish Plaintiffs' claims are common to all the Class Representatives and all members of the Class – they would all seek to prove that the Class Vehicles have common defects and that GM's conduct was wrongful.  See *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004) ("[I]f common issues truly predominate over individualized issues in a lawsuit, then 'the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered.'") (quoting *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 322 (5th Cir. 1978)).

## 2.  Class Treatment of Plaintiffs' Claims is Superior

The second prong of Rule 23(b)(3) requires a court to determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Sacred Heart Health*, 601 F.3d at 1183 (citing Fed. R. Civ. P. 23(b)(3)). The focus of the analysis is on "the relative advantages of a class action suit over whether other forms of litigation might be realistically available to the plaintiffs." *Id.* (quoting *Klay*, 382 F.3d at 1269).

The Court finds that a class action is the superior method for adjudicating Plaintiffs' and Settlement Class Members' claims. Here, individual Settlement Class Members have little incentive to control the prosecution of separate individual actions because the time and expense associated with such litigation would easily exceed the potential individual recovery.  And, as the Supreme Court said in *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997), "[t]he policy

24

at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." The potential recovery on the economic damage claims sought to be certified in this action—the cost of repair or replacement—is too small to warrant individuals taking on the cost and burden of litigating individual lawsuits against such a large corporate defendant like GM. Thus, resolution of thousands of claims in one action is far superior to individual lawsuits, because it promotes consistency and efficiency of adjudication.  *See* Fed. R. Civ. P. 23(b)(3).

### C.    The Class Is Ascertainable

In addition to satisfying the requirements of Rule 23, a Rule 23(b)(3) class must also be ascertainable before it may be certified.  *See Karhu v. Vital Pharms., Inc.* 621 Fed. Appx. 945, 946 (11th Cir. 2015).  A class is ascertainable if it can be identified in an "administratively feasible" manner.  *Id.* at 948. This implicit requirement of Rule 23 requires that a class be identified in a way that does not solely rely on a defendant's records for identification purposes.  *Id.*

Here, the proposed Class is defined to include all persons who purchased or leased a Class Vehicle in the United States. Settlement Class Members were ascertained using GM's sales records, state motor vehicle registration data, and data obtained by IHS Markit/R.L. Polk & Co. Class membership is clearly based on the objective criteria of whether a person purchased or leased a Class Vehicle in the United States. It is not based on any subjective factors. Therefore, the Court finds the Settlement Class is ascertainable.

## V.    SERVICE AWARDS

The Court grants Class Representatives Ellen Berman, Patrick Sanchez, Mark Stauber and Sally Stauber, Jacob Ross-Demmin, Jennifer Herrington, Ryan Hindsman, Robin Peterson, Diana Miranda, Vanessa Maryanski, Rene Mitchell, and Brittany Chambers a service payment of

$4,500.00 each, for her or his services as Class Representative.  The Court finds the service payment of $4,500.00 for each Class Representative to be appropriate, fair and reasonable.  This amount is being paid by Defendant General Motors separately from the funds made available to Class Members pursuant to the Settlement Agreement.

## VI.    ATTORNEYS' FEES AND COSTS

Class Counsel seeks an order which (i) awards Class Counsel attorneys' fees in the amount of $3,390,351, which represents approximately 8% of the estimated minimum value of the settlement benefits,[9] including notice and administration costs, and (ii) grants reimbursement of litigation expenses in the amount of $109,649. As detailed in Plaintiffs' Unopposed Motion for Attorneys' Fees and Expenses and Class Representative Service Payments (ECF 121), Class Counsel's fee request is reasonable, and is entirely consistent with the prevailing law in the Eleventh Circuit and this District.

In the Eleventh Circuit, "it is well established that when a representative party has conferred a substantial benefit upon a class, counsel is entitled to attorneys' fees based upon the benefit obtained." *Gevaerts v. TD Bank, N.A.*, No. 11:14-cv-20744-RLR, 2015 WL 6751061, at *10 (S.D. Fla. Nov. 5, 2015) (Rosenberg, J.) (citing *Camden I Condo Ass'n v. Dunkle*, 946 F.2d 768, 771 (11th Cir. 1991) (*Camden I*).

In *Camden I*, the Eleventh Circuit held that "the percentage of the fund approach [as opposed to the lodestar approach] is the better reasoned in a common fund case. Henceforth in this Circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage

---

[9] The benefits of the Settlement include both (1) GM's and Plaintiffs' estimate, detailed herein, that the 2013 SCA alone has an estimated value of at least $40 million, and (2) the new opportunity of used and former owners to seek reimbursement for out-of-pocket repair and rental car payments, which offers tangible value despite being incapable of more precise estimation.

of the fund established for the benefit of the class." *Id.*, quoting *Camden I*, 946 F.2d at 774. The Eleventh Circuit has applied this percentage-based approach to "claims-made settlements," noting that a "claims-made settlement is ... the functional equivalent of a common fund settlement where the unclaimed funds revert to the defendant." *Poertner v. Gillette Co.*, 618 Fed. Appx. 624, 628 n.2 (11th Cir. 2015).

"This Court has substantial discretion in determining the appropriate fee percentage awarded to counsel." *Gavaerts*, 2015 WL 6751061, at *10. "There is no hard and fast rule mandating a certain percentage of a common fund which may be awarded as a fee because the amount of any fee must be determined upon the facts of each case." *Id.* (citations omitted). As a general rule "[t]he majority of common fund fee awards fall between 20% to 30% of the fund," although "an upper limit of 50% of the fund may be stated as a general rule." *Id.*

Moreover, in *Camden I*, the Eleventh Circuit instructed courts to further evaluate common fund awards based on reasonableness factors set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974) (the "*Johnson* factors"). The *Johnson* factors include: (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and the length of the professional relationship with the client; (12) awards in similar cases. *Camden I*, 946 F.2d at 772, n.3. As set forth below, the *Johnson* factors are readily met here.

1. **The Time and Labor Required, Preclusion from Other Employment and the Time Limits Imposed Justify the Fee Amount**

The first, fourth and seventh *Johnson* factors – the time and labor, preclusion of other employment, and time limitations imposed – each heavily support the reasonableness of Class Counsel's fee request.

From initiating this action until reaching the proposed Settlement, Class Counsel was continuously engaged in vigorous litigation against a well-capitalized Defendant represented by sophisticated counsel. Prosecuting and settling this Action demanded considerable time and labor. This substantial work has included investigating the claims at issue, motion practice, engaging in extensive fact discovery, attending GM's inspections of various proposed Class Representatives' vehicles, attending mediation, and engaging in several subsequent months of arm's-length negotiations between experienced counsel. Further, Plaintiffs consulted and retained knowledgeable and qualified experts who performed critical analyses regarding the alleged defects. This work diverted substantial time and resources from other matters. *See Yates v. Mobile Cty. Pers. Bd.*, 719 F.2d 1530, 1535 (11th Cir. 1983) (the expenditure of time "necessarily had some adverse impact upon the ability of counsel for plaintiff to accept other work, and this factor should raise the amount of the award.").

2. **The Case Involved Difficult Issues, and the Risk of Nonpayment in this Contingent Litigation, and Not Prevailing on the Claims Was High**

The second, sixth and tenth *Johnson* factors – the novelty and difficulty of the questions, the contingent nature of the case, and the undesirability of the case – also support the requested fee award. This case involved difficult and novel issues that presented a significant risk of nonpayment.

As discussed in Plaintiffs' Unopposed Motion for Attorneys' Fees and Expenses and Class Representative Service Payments (ECF 121), in the California action, the court granted and denied in part GMs motion to dismiss, leaving plaintiffs with breach of warranty claims based solely on the prior 2010, 2011 and 2012 SCAs.  GM planned to file motions to dismiss in the Illinois and Florida Actions, seeking to dismiss each case in its entirety.  Given the track record of losing significant claims in the order of dismissal in the California action, the possibility of failing in their efforts to certify the class, and the risk of losing on summary judgment or at trial, the Settlement represents an outstanding result.

The difficult and contingent nature of this case further demonstrates its undesirability. There are few lawyers willing to invest significant time and resources prosecuting a lawsuit that involves complicated and uncertain legal questions and a substantial risk of receiving no compensation. Although Class Counsel managed to achieve an excellent result for the Settlement Class, this outcome was anything but certain until the Settlement was reached.

### 3.  Class Counsel Achieved an Excellent Result for the Settlement Class

The eighth *Johnson* factor focuses on the results achieved for the Class. The result achieved here is exemplary, because the Settlement provides precisely what the actions were filed to obtain, repair of the Class Vehicles and reimbursement to Class Members for related and covered out-of-pocket costs. Here, the Settlement covers the claims of Class Members in full and has an estimated value, including notice and administration costs, of at least $42 million.   Moreover, the amount of the Settlement is uncapped; thus, the actual payments to Class Members could exceed this amount and each Class Member's recovery would not have to be reduced pro rata (or otherwise), as settlements with a capped amount often require.  This is a substantial benefit. Regardless of the

total cost, GM is obligated to pay the full value of every single claim that falls within the
parameters of the Settlement Agreement.

### 4.   The Requested Fee Amount is Well Below the Market Rate in Similar Class Cases and Is Separate from the Funds Made Available to the Class.

The fifth and twelfth *Johnson* factors – the customary fee, and awards in similar cases –
also support approval. These factors weigh in favor of awarding Class Counsel the requested fee,
which amounts to a mere 8% of the value of the benefits obtained by the Settlement. A separately
paid fee amounting to 8% of the estimated value of benefits obtained for the class is well below
the market rate for class action fee awards in the Eleventh Circuit. *See Nelson v. Mead Johnson &
Johnson Co.*, 484 Fed. Appx. 429 (11th Cir. 2012) (upholding fee award of 25% of common fund
in claims-made settlement in which defendant agreed to send claimants free baby formula up to a
certain aggregate value).

### 5.   The Skill, Experience, Reputation, and Ability of Class Counsel

The remaining *Johnson* factors – the skill required to perform the legal services properly
and the experience, reputation, ability of the attorneys, and the nature of the professional
relationship with the clients – confirm that the fees sought are reasonable.

In the Preliminary Approval Order, this Court previously found that Class Counsel "are
competent and capable of exercising their responsibilities, and [] have fairly and adequately
represented the interests of the Settlement Class." ECF 29, at 3. Further, as shown above, Class
Counsel achieved a settlement that confers substantial monetary and non-monetary benefits to the
Settlement Class Members despite the hard-fought litigation against sophisticated and well-
financed Defendant represented by top-tier counsel. *See In re Sunbeam Sec. Litig.,* 176 F. Supp.2d
at 1334 ("In assessing the quality of representation, courts have also looked to the quality of the
opposition the plaintiffs' attorneys faced."). This outstanding result was made possible by Class

Counsel's extensive experience litigating class actions of similar size, scope, and complexity like the instant Action.

Out of the over 1.64 million Class Members, two individuals objected to the amount of the attorneys' fees requested: Fitzpatrick (ECF 47) and Abaid (ECF 80). Fitzpatrick argues that the fees are not justified because there is no benefit to the Class. Abaid argues that Class Counsel should work *pro bono* and receive no fees because the Settlement does not provide full repayment of all her repair costs (including repair on her front axle) and a host of other complaints. Neither objector supports these arguments with any reasoning, analysis, or case law. As described herein, the Settlement does provide substantial value to the Class.

For these reasons, the Court grants Class Counsel's application for fees in the amount of $3,390,351.00, which is being paid by Defendant General Motors separately from the funds made available to Class Members pursuant to the Settlement Agreement.

The Court also grants Class Counsel's application for costs in the amount of $109,649.00, which is being paid by Defendant General Motors separately from the funds made available to Class Members pursuant to the Settlement Agreement.

## VII.   CONCLUSION

For the reasons discussed herein:

1.      The Court hereby finally approves the Settlement Agreement and the Settlement contemplated thereby, and finds that the terms constitute, in all respects, a fair, adequate and reasonable settlement as to all Settlement Class Members in accordance with Rule 23 of the Federal Rules of Civil Procedure, and directs its consummation pursuant to its terms and conditions. Further, the class definition is sufficiently ascertainable such that an individual can ascertain whether he or she is in the Settlement Class based on objective criteria.

2.     The Court hereby finds and concludes that the Settlement Class Notice and procedures set forth in the Settlement Agreement fully satisfy Rule 23 of the Federal Rules of Civil Procedure and the requirements of due process, were the best notice practicable under the circumstances, and support the Court's exercise of jurisdiction over the Settlement Class as contemplated in the Settlement and this Order. The Court hereby finds and concludes that the notice provided by GM to the appropriate State and federal officials pursuant to 28 U.S.C. § 1715 fully satisfied the requirements of that statute.

3.     The Court hereby orders that each of those individuals listed in Exhibit C of the Declaration of Richard Simmons (ECF 120-7) is excluded from the Settlement Class, unless they submit a Claim Form on or before the Claim Deadline.  Those individuals listed in Exhibit C of the Declaration of Richard Simmons (ECF 120-7) and who do not submit a Claim Form prior to the Claim Deadline will not be bound by the Settlement Agreement, and neither will they be entitled to any of its benefits.

4.     Plaintiffs and each and every one of the Settlement Class Members who have not requested exclusion from the Settlement Class, hereby unconditionally, fully, and finally release and forever discharge the Released Parties from the Released Claims.  Each and every Settlement Class Member, and any person actually or purportedly acting on behalf of any Settlement Class Member(s), is hereby barred from commencing, instituting, continuing, pursuing, maintaining, prosecuting, or enforcing any Released Claims (including, without limitation, in any individual, class or putative class, representative or other action or proceeding), directly or indirectly, in any judicial, administrative, arbitral, or other forum, against the Released Parties.

5.     The Court hereby finds that the Settlement Class Members have been adequately represented by the Class Representatives and Class Counsel, and that the relief provided is fair,

adequate, and reasonable, considering the costs, risks, and delay of trial and appeal, the effectiveness of the proposed method of distributing relief and method of processing claims, and all other relevant factors, and that the Settlement treats Class Members equitably relative to each other.

6.      The Court hereby (i) awards Class Counsel attorneys' fees in the amount of $3,390,351.00, (ii) grants Class Counsel reimbursement of litigation expenses in the amount of $109,649.00; and (c) grants Service Payments of $4,500.00 for each of the Plaintiffs.

7.      If for any reason the Settlement terminates, then certification of the Settlement Class shall be deemed vacated. In such an event, the certification of the Settlement Class for settlement purposes or any briefing or materials submitted seeking certification of the Settlement Class shall not be considered in connection with any subsequent class certification issues, and the Parties shall return to the status quo ante in the Action, without prejudice to the right of any of the Parties to assert any right or position that could have been asserted if the Settlement had never been reached or proposed to the Court.

8.      The objections to the Settlement and to the application by Class Counsel for attorneys' fees and expenses, and the objections to the application by Class Counsel and Class Representatives for Service Payments have been reviewed by the Court, and are without merit and are overruled.

9.      The Court hereby dismisses the Action, with prejudice, without costs to any party, except as expressly provided for in the Settlement Agreement.

10.     The Clerk of the Court is directed to enter this Order on the docket and enter final judgment forthwith.

11.     The Court retains jurisdiction of all matters relating to the interpretation, administration, implementation, effectuation, and enforcement of the Settlement.


IT IS SO ORDERED in Chambers at Fort Pierce, Florida this _____ day of November 2019.


_____
Hon. Robin L. Rosenberg
United States District Judge