**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 2:18-CV-14371-ROSENBERG/MAYNARD**

ELLEN BERMAN and DAYANA
GUACH, on behalf of themselves and all
others similarly situated,

Plaintiffs,

        v.

GENERAL MOTORS LLC, a Delaware
limited liability company,

Defendant.

_____

**<ins>FINAL APPROVAL ORDER AND JUDGMENT</ins>**

THIS CAUSE is before the Court on Plaintiffs' Motion for Final Approval of Class Action

Settlement (DE 120) and Motion for Attorneys' Fees (DE 121) ("the Motions").  The Court held

a Final Approval Hearing on October 3, 2019 ("Final Approval Hearing"), notice of which was

provided to class members in accordance with this Court's Order at docket entry 29 ("Preliminary

Approval Order"), which (1) conditionally certified the settlement class, (2) preliminarily

approved the class action settlement, (3) approved the notice plan, and (4) set the Final Approval

Hearing.  The Court has reviewed the Motions, the record, and Class Members' objections to the

proposed settlement, with the benefit of oral argument at the Final Approval Hearing from both

the parties and objectors Douglas R. Ghiselin, Tod Fitzpatrick, and Leslie G. Coulter appearing

through counsel ("Represented Objectors").  The Court is fully advised in the premises, and after

thorough consideration, the Court GRANTS the Motions for the reasons discussed below.

## I.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The complaint alleges the following: Defendant General Motors LLC ("GM") manufactured and knowingly sold certain defective vehicles.  Model year 2010–2013 Chevrolet Equinox and GMC Terrain vehicles equipped with 2.4-liter Ecotec engines (the "Class Vehicles")[1] suffer from an oil consumption defect which causes the Class Vehicles to consume oil at an usually high rate.  Although several features of the vehicles' engines contribute to the oil consumption defect, the primary cause is faulty piston rings.  The piston rings are prone to premature wear, which can result in a loosening of the seal surrounding the pistons and oil flowing into the engine's combustion chamber.  The oil consumption defect requires the driver to replenish the vehicle's oil more frequently.  Otherwise, the engine's oil pressure may drop to a dangerously low level, causing engine damage or failure.

Beginning in 2014, GM issued Special Coverage Adjustments ("SCAs") for the model years 2010, 2011, and 2012 of the Class Vehicles.  The SCAs extended the Class Vehicles' warranty to cover piston replacement beyond the period after which the warranties would normally expire, ordinarily 5 years or 100,000 miles.  The SCAs provided that owners of Class Vehicles could take their vehicles to a dealership and undergo an oil consumption diagnosis.  If the diagnosis indicated excessive oil consumption, GM would replace the piston rings for free, if the vehicle was within certain time and mileage limitations (see Table 1, *infra*).  Further, owners of Class Vehicles who paid out-of-pocket for piston replacement were entitled to submit a claim for reimbursement within one year of the relevant SCA's issuance.

---

[1] A Production Change occurred in May 2013 which modified the piston rings used in the engines.  Accordingly, only those vehicles manufactured prior to the Production Change are included in the definition of Class Vehicles. DE 27-1 ¶ 12.

| Table 1: Special Coverage Adjustments (SCAs) | | | | |
|---|---|---|---|---|
| Model Year | Time Limitation | Mileage Limitation | Date Issued | Deadline for Out-of-Pocket Claims |
| 2010 | 10 years | 120,000 miles | August 2014 | September 30, 2015 |
| 2011 | 7 years, 6 months | 120,000 miles | August 2015 | August 31, 2016 |
| 2012 | 7 years, 6 months | 120,000 miles | May 2017 | May 31, 2018 |

Plaintiffs[2] filed the complaint on September 10, 2018, asserting claims for breach of written warranties under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, breach of implied and express warranties, and violations of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* ("FDUTPA"). In addition to the instant action, related class actions were previously filed against GM in the United States District Court for the Northern District of California on September 14, 2017 (*Hindsman v. General Motors LLC*, No. 17-cv-5337 ("*Hindsman*")), and in the United States District Court for the Northern District of Illinois on April 19, 2018 (*Sanchez v. General Motors LLC*, No. 18-cv-02536 ("*Sanchez*")). These actions (together with this case, the "Related Actions") are based on similar allegations regarding the oil consumption defect. In *Hindsman*, the court granted in part and denied in part a motion to dismiss filed by GM. GM had not responded to the complaint in *Sanchez* by the time the Settlement was reached. This Settlement resolves all Related Actions.

## II.    SUMMARY OF SETTLEMENT TERMS

The Settlement Agreement[3] defines the Settlement Class is defined as follows:

> All persons within the United States who purchased or leased, at any time before the Preliminary Approval Date, a new retail or used model year 2010, 2011, 2012, or 2013 Chevrolet Equinox or GMC Terrain vehicle equipped with 2.4 liter Ecotec engines, manufactured prior to the Production Change, and who have not

---

[2] Plaintiff Dayana Guach voluntarily dismissed her claims on April 22, 2019, leaving Ellen Berman as the only named Plaintiff in this action. DE 25. This Order uses the term "Plaintiffs" throughout for the sake of consistency.
[3] The Settlement Agreement, including its exhibits (DE 27-1), and the definition of words and terms contained therein, are incorporated by reference in this Order.

executed a prior release of claims related to Class Vehicle oil consumption or resulting piston or engine damage in favor of GM.

As described in detail in Plaintiffs' Motion for Final Approval of Class Action Settlement (DE 120), and discussed at the Final Approval Hearing, the Settlement Agreement contains the following relief for the Settlement Class:

1. ***Model Year 2010–2012 Class Vehicles.*** Within 30 days of the Effective Date of the Settlement, Class Members will be (i) provided direct notice that the SCAs remain in effect, along with a Claim Form; and (ii) afforded a new opportunity to submit a reimbursement claim for expenses previously incurred (subject to the SCA time and mileage limitations). In other words, Class Members remain entitled to free replacement of piston assemblies at authorized dealerships, subject to an oil consumption diagnosis[4] and their vehicle being within the SCA time and mileage limitations (see Table 1, *supra*). Further, Class Members who paid out-of-pocket for covered repairs while their vehicles were within the time and mileage limitations of the SCAs, but who did not previously submit a claim, will have a new 120-day period in which to submit a claim. For the first time, rental car expenses associated with the oil consumption defect are covered. Further, the notices include clarifying language with respect to the scope of coverage for repairs to engine components (see section 3 below). There is no cap on the amount of expenses a Class Member may claim for covered repairs and rental car expenses.

2. ***Model Year 2013 Class Vehicles.*** Pursuant to the Settlement Agreement, GM will issue a new SCA for 2013 Class Vehicles within thirty (30) days of the Effective Date of the Settlement. This SCA will have substantially the same terms as the SCAs for prior model years. Class Members may receive free piston assembly replacement, subject to SCA limitations and an

---

[4] To qualify for replacement, the Class Vehicle must consume more than one quart of oil per 2,000 miles. DE 27-1, at 20.

oil consumption diagnosis.  In addition, Class Members who previously paid out-of-pocket for covered repairs and expenses may file claims for reimbursement of such expenses, including vehicle rental charges.  There is no cap on the amount a Class Member may claim for covered repairs or rental car expenses.  Pursuant to the Settlement Agreement, each Class Member subject to the 2013 SCA will be issued direct notice of their rights and obligations under the Settlement.

       3.     ***Notice and Claim Forms***.  Pursuant to the Settlement Agreement, the Notice and Claim Forms will be disseminated to all Class Members, informing them of the Settlement approval and providing them with a Claim Form to submit reimbursement for the aforementioned expenses.  The Court, the parties, and the Represented Objectors discussed at the Final Approval Hearing whether the language of the original notice forms was susceptible to the interpretation that piston assembly replacement was the sole out-of-pocket cost covered.  In fact, the SCAs provide: "All reasonable and customary costs to correct the condition described in this bulletin should be considered for reimbursement."[5]  The parties agreed that a revision of the forms was appropriate to confirm the parties' understanding that any necessary engine repair traceable exclusively to the oil consumption defect was within the scope of the Settlement.  Accordingly, the Notice and Claim Forms, DE 159, Exs. A–C, include clarifying language that the Settlement covers reimbursement for repairs and/or replacement of engine components that are or were required and solely caused by excessive oil consumption due to piston ring wear.  Relatedly, the Notices to Opt-Outs and Claim Forms, DE 159, Exs. D–E, will be sent to the approximately 1,709 individuals who opted-out of the Settlement Class, directing their attention to the clarifying language and giving them an opportunity to return to the Settlement Class, should they wish to do so.

---

[5] DE 27-1, at 118, 127.  This language appears in the 2010 and 2011 SCAs.  The 2012 SCA provides: "Customer requests for reimbursement of previously paid repairs to correct the condition described in this bulletin are to be submitted to the dealer prior to or by May 31, 2018.  DE 27-1, at 137.

4.     ***The Release***.  In exchange for the above consideration, Class Members agree to release their claims.  The Release here is limited to claims "that were brought or could have been brought based on the facts alleged in the Action and Related Actions that relate in any manner to claims of excessive oil consumption or *resulting* piston or engine damage in Class Vehicles as alleged in the Action and the Related Action."  DE 27-1 ¶ 70 (emphasis added).  Engine damage claims unrelated to the oil consumption defect are not released.  Moreover, only those persons who are identified by GM on the Class List (and thus are mailed a Class Notice), and who do not opt out of the Settlement, release their claims.

## III.     STANDARD OF REVIEW

Judicial and public policy favor the voluntary settlement of class litigation.  *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992) ("Public policy strongly favors the pretrial settlement of class action lawsuits.").  Thus, "there exists 'an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being [the] most complex.'"  *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1314 (S.D. Fla. 2005) (citations omitted).  With a settlement, class members are ensured a benefit as opposed to "the mere possibility of recovery at some indefinite time in the future."  *In re Domestic Air Transport. Antitrust Litig.*, 148 F.R.D. 297, 306 (N.D. Ga. 1993).

A settlement should be approved if it is fair, reasonable, and adequate, and not the product of collusion.  *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984).  In determining whether a settlement is "fair, adequate, and reasonable," the following factors are generally considered:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and

amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*Bennett*, 737 F.2d at 986. "In assessing these factors, the Court 'should be hesitant to substitute . . . her own judgment for that of counsel.'" *Lipuma*, 406 F. Supp. 2d at 1315 (quoting *In re Smith*, 926 F.2d 1027, 1028 (11th Cir. 1991)).  Ultimately, "[a] settlement is fair, reasonable and adequate when 'the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued.'" *In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d at 1344 (citations omitted).

## IV.    DISCUSSION

### 1.    The Settlement is the Product of Informed, Arm's-Length Negotiations

A threshold consideration in determining whether to grant final approval of a class action settlement is whether a proposed settlement is the product of fraud or collusion between the parties. "In determining whether there was fraud or collusion, the Court examines whether the settlement was achieved in good faith through arm's-length negotiations, whether it was the product of collusion between the parties and/or their attorneys, and whether there was any evidence of unethical behavior or want of skill or lack of zeal on the part of class counsel." *Canupp v. Sheldon*, No. 04-cv-260, 2009 WL 4042928, at *9 (M.D. Fla. Nov. 23, 2009) (citing *Bennett*, 737 F.2d at 987 n.9.).

Here, there is no indication of fraud or collusion.  The Settlement Agreement was only reached after the ruling on GM's motion to dismiss in *Hindsman*, receipt of discovery from GM in that case, retention of experts, inspections of all Class Representative vehicles in *Hindsman* and *Sanchez*, and numerous conferences among adverse counsel.  In addition, the Settlement was reached with the assistance of a neutral mediator with substantial experience mediating class actions, which further demonstrates the absence of collusion.  *See Ingram v. The Coca-Cola Co.*,

200 F.R.D. 685, 693 (N.D. Ga. 2001) ("The fact that the entire mediation was conducted under the auspices of … a highly experienced mediator[] lends further support to the absence of collusion."); *see also In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d at 1345, 1349 (finding an absence of collusion where settlement was reached with the assistance of a well-qualified, experienced mediator).

A sole objector accused the parties of collusion (DE 80). However, other than dissatisfaction with the Settlement, the objector provided no evidence to support this allegation. Further, at the Final Approval Hearing, counsel for the Represented Objectors stated that "I never said there was any collusion, I don't doubt class counsel and Defense counsel's good faith, not at all." Final Approval Hearing Transcript, at 58:8–10. Having considered the parties' briefing, oral arguments, and the parties' history litigating the Related Cases in other courts, the Court is satisfied that the Settlement Agreement is the product of arm's-length negotiation.

### 2.      The Settlement is Fair, Reasonable, and Adequate

#### a.   *Likelihood of Success at Trial*

"The likelihood of success on the merits is weighed against the amount and form or relief contained in the settlement." *Lipuma*, 406 F. Supp. 2d at 1319. Where success at trial is uncertain, this factor weights in favor of approving the settlement. *Newman v. Sun Capital, Inc.*, No. 09-cv-445, 2012 WL 3715150, at *11 (M.D. Fla. Aug. 28, 2012). The Court concludes, having reviewed the complaint here and the *Hindsman* court's ruling, that Plaintiffs' likelihood of succeeding on the merits is low. In *Hindsman*, the court dismissed the plaintiffs' express warranty claims on the basis that the complaint alleged a design defect, which was not covered by the terms of the original limited warranties issued at the time of sale. *Hindsman*, 2018 WL 2463113, at *8. The court also dismissed the implied warranty claims as time-barred under California's four-year statute of

limitations, and concluded that the plaintiffs had not established that GM fraudulently concealed the oil consumption defect so as to toll the statute of limitations. *Id.* at \*14–\*15. The court did not dismiss warranty claims in which certain plaintiffs alleged they experienced the oil consumption defect within the SCA's limitations and GM failed to repair the defect. *Id.* at \*11.

GM would presumably have raised similar defenses in this case, particularly with respect to statutes of limitations. *See* Fla. Stat. § 95.11(2)(b) (five-year statute of limitations for express-warranty claims); § 95.11(3)(f) (four-year statute of limitations for claims under FDUTPA). And Plaintiffs would have had similar difficulty tolling the statute of limitations under a theory of fraudulent concealment. *See Licul v. Volkswagen Grp. of Am.*, Case No. 13-cv-61686, 2013 WL 6328734, at \*6 (S.D. Fla. Dec. 5, 2013) (noting that fraudulent concealment under Florida law requires "active and willful concealment" rather than "mere non-disclosure"). To the extent that Plaintiffs made meritorious claims based on breach of the SCAs, rather than the original limited warranties, there is a question whether such claims would share enough common facts to support a class action.

> b. *Range of Possible Recovery, and Point at Which Settlement is Fair, Adequate, and Reasonable*

The Court considers the second and third *Bennett* factors together. "The range of possible recovery spans from a finding of non-liability to a varying range of monetary and injunctive relief. In considering the question of a possible recovery, the focus is on the possible recovery at trial." *Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 693 (S.D. Fla. 2014) (internal citation and quotation marks omitted). However, "[m]onetary relief is difficult to quantify." *Lipuma*, 406 F. Supp. 2d at 1322. Thus, in evaluating a class settlement, "the Court's role is not to engage in a claim-by-claim, dollar-by-dollar evaluation, but rather, to evaluate the proposed settlement in its totality." *Id.* at 1323. "A settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery." *Mahoney v. TT of Pine Ridge, Inc.*, No.

17-cv-80029, 2017 WL 9472860, at *5 (S.D. Fla. Nov. 20, 2017) (quoting *Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988).

Here, given the risks associated with continued litigation, the potential recovery is low. A Class Member who is victorious on the merits would likely establish maximum damages of the costs of engine repair, with a more typical amount of damages being the $2000 required for a piston assembly replacement. But, as discussed above, the most viable legal theory for recovery— breach of the SCAs, rather than breach of the original limited warranty—might not, standing alone, be appropriate for class adjudication under Rule 23. If that case, there would likely be no recovery at all.

In light of the minimal expected recovery, the Settlement offers substantial benefits to Class Members. The Settlement provides two primary forms of consideration. First, it provides new notice of the 2010–2012 SCAs, extends coverage for rental car expenses, and extends the deadline for out-of-pocket claims. The new notice clarifies the scope of covered repairs and expenses: in addition to rental car expenses, the settlement includes ***any*** necessary repairs for engine damage caused by the oil consumption defect, not solely piston replacement.

Further, the additional notice will reach Class Members who did not receive notice of the SCAs when they were first issued. By way of example, suppose a Class Member purchased a used Class Vehicle after the SCA covering that model year had already been issued. If such Class Member paid for repairs while the vehicle was within the SCA's time and mileage limitations, that Class Member is receiving her first ever notice of the availability for repairs and a new four-month period to submit reimbursement claims. Although the parties did not have a basis to reliably calculate the number of Class Members who fall into this category, the parties estimate that most of the 568,623 prior, used, or other non-original owners who received notice of the proposed

Settlement did not receive notice of the SCAs when they were first issued. DE 149–2. And because the estimated cost of the typical piston replacement is $2,000, DE 120-4 ¶ 7, each one percent of 2010–2012 Class Vehicle owners who submit an out-of-pocket claim adds approximately $11.5 million to the value of the Settlement. DE 120, at 9.

Second, GM will issue a new SCA under the Settlement covering model year 2013 Class Vehicles on substantially the same terms as prior SCAs. GM calculated the anticipated cost of the 2013 SCA using the same process used in its ordinary course of business, which indicated that roughly 7.4 percent of the 270,000 model year 2013 Class Vehicles will take advantage of repairs under the SCA, resulting in a value of $40.5 million. DE 149-3. This is a substantial dispensation relative to the likely recovery at trial.

The Represented Objectors argue, and the Court recognizes, that the Settlement does not compensate Class Members for each harm identified in the complaint—for example, diminished resale value of the vehicles and incidental maintenance expenses. Regardless of whether these harms would have been compensable upon victory at trial, the fairness of a settlement does not depend on whether the result is equivalent to a victory at trial. *In re Checking Account Overdraft Litig.*, No. 09-MD-02036, 2015 WL 12641970, at *8 (S.D. Fla. May 22, 2015). Rather, the Settlement is fair, adequate, and reasonable in light of the relatively low potential recovery, amounting to no more than a few thousand dollars per Class Member whose claims could survive GM's likely defenses. Based on the Court's consideration of the instant record and the *Hindsman* court's analysis, very few Class Members were likely to have such claims.

### c.   *Complexity, Expense, and Duration of Litigation*

Under this factor, the Court "consider[s] the vagaries of litigation and compare[s] the significance of immediate recovery by way of the compromise to the mere possibility of relief in

the future, after protracted and expensive litigation." *Lipuma*, 406 F. Supp. 2d at 1323 (quoting *In re Shell Oil Refinery*, 155 F.R.D. 552, 560 (E.D. La. 1993)).  "The law favors compromises in large part because they are often a speedy and efficient resolution of long, complex, and expensive litigations." *Behrens*, 118 F.R.D. at 543.  If this case proceeded to trial, the parties would incur significant expenses, including the payment of expert witnesses and technical consultants, along with substantial time devoted to briefing Plaintiffs' motion for class certification and *Daubert* motions, preparing for and conducting trial, post-trial motion practice, and appeal.  Continuing to litigate this case and the Related Cases would require much of the parties' resources and would delay relief for Class Members.  This Settlement represents an efficient alternative to what may otherwise be a prolonged and complex class action.

### d.  Substance and Amount of Opposition to Settlement

Objections to class action settlements are an important part of the Rule 23 process.  In determining whether a class action settlement is fair, reasonable, and adequate, the Court must consider the reaction of absent class members. *Bennett,* 737 F.2d at 986.  Here, direct mail notice was sent to 1,641,531 Class Members.  Of those 1,641,531 Class Members, 70 submitted objections, which represents 0.0043 percent of Class Members.  Further, 1,709 Class Members submitted valid opt-outs, amounting to approximately one-tenth of one percent of Class Members.  These "low opt-out and objection rates weighs in favor of granting final approval" of the Settlement. *Burrow v. Forjas Taurus S.A.*, No. 16-cv-21606, 2019 WL 4247284, at *10 (S.D. Fla. Sept. 6, 2019); *see also Lipuma*, 406 F. Supp. 2d at 1324 ("In determining whether a proposed settlement is fair, reasonable and adequate, the reaction of the class is an important factor.").  Further, no state or federal government officials filed objections, which also weighs in favor of granting final approval.

The Court has read and considered all written objections and arguments made on behalf of the Represented Objectors at the Final Approval Hearing. These objections generally include, but are not limited to: (1) the propriety of the time and mileage limitations of the SCAs, (2) whether the Settlement offers consideration and fair value for the release of Class Members' claims, and whether the 2013 SCA is a bargained-for benefit of the Settlement; (3) whether the Settlement is the product of collusion; (4) whether there was adequate assessment of the potential range of recovery; and (5) whether attorneys' fees are supported. The Court has concluded that the Settlement was not collusive and that the Settlement is reasonable in light of the modest prospects of recovery. The Court discusses attorneys' fees in Part VII, *infra*. A discussion of the most typical objections—the SCA limitations and the consideration for the release of claims—follows below.

First, many objectors claimed to have experienced a symptom of the oil consumption defect after the time or mileage limitation of the relevant SCA had expired. It is true that not every Class Member will have experienced the oil consumption defect within the SCA's parameters, and thus not every Class Member will benefit from the additional notice and reimbursement opportunity. That is, the defect must have arisen and been repaired within seven years and six months (or for 2010 Class Vehicles, within 10 years) of the Class Vehicle's original sale or within 120,000 miles, whichever is reached first. The Court appreciates the frustration of those whose vehicles fall outside of the SCA limitations. But the law recognizes that manufacturers must draw a line somewhere when it comes to express warranties, and the SCAs are, for all intents and purposes, extended warranties. *Hindsman*, 2018 WL 2463113, at *9 (concluding that the SCAs are warranties); *see also Licul*, 2013 WL 6328734, at *2 ("To hold that a manufacturer's knowledge of potential failures renders such limitations unenforceable would thus 'render meaningless

time/mileage limitations in warranty coverage,' and would be contrary to the overwhelming weight of precedent enforcing such limitations.") (quoting *Abraham v. Volkswagen of Am., Inc.*, 795 F.2d 238, 250 (2d. Cir. 1986)) (internal citation omitted).  The Represented Objectors argue that reopening the reimbursement period under the 2010–2012 SCAs is not valuable in part because those whose repairs occurred outside the SCA limitations would not be entitled to reimbursement. However, this argument depends on the limitations themselves being problematic, which the Court has no basis to conclude.

For example, in *Collado v. Toyota Motor Sales, U.S.A., Inc.*, No. CV-10-3124-R, 2011 WL 5506080, at *2 (C.D. Cal. Oct. 17, 2011) (rev'd on other grounds), the district court rejected objections that the settlement's 5-year/50,000 mile time and mileage restrictions were unfair, stating that "there has to be some reasonable limit to the warranty period, as any longer warranty period would defeat the purpose of a limited warranty." *See also In re Nissan Radiator/Transmission Cooler Litig.*, No. 10-cv-7493, 2013 WL 4080946, at *11 (S.D.N.Y. May 30, 2013) (objections to the 10 year/100,000 mile cut-off was "not a basis for finding the settlement is unfair or unreasonable").  The rationale of these cases applies here: there must be reasonable limits in any settlement, and those will vary from case to case.[6]  Those for whom the oil consumption defect manifested outside the SCA limitations could have opted out of the Settlement and pursued claims against GM in separate actions.  *See Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1241–42 (11th Cir. 2012) (objections that a settlement deprived class members of rights under a consumer protection statute were "unconvincing" since class members were "free to opt out of the class and still have the option of . . . filing an individual suit").

---

[6]  Each of the Class Vehicles was sold with a five (5) year, one-hundred-thousand (100,000) mile warranty.  Final Hearing Transcript, at 9.

Second, the Settlement offers consideration for the release of Class Members' claims. Every Class Member receives a new opportunity to submit claims for reimbursement of covered expenses, which includes, for the first time, rental car expenses.  Notice is particularly valuable in this context because many Class Vehicles have changed owners since the SCAs were issued, discussed above, and notice is being sent to all Class Members in the chain of title.  And to the extent covered expenses were incurred after the original reimbursement deadlines, such expenses have become reimbursable for the first time.  Further, the parties have confirmed—and drafted new notice forms for the avoidance of doubt—that Class Members who required repairs for engine damage caused solely by the oil consumption defect would be entitled to reimbursement, subject to the terms of the SCAs.  This means that the Class Members who suffered the greatest damage— engine replacement—are covered by the Settlement, subject to the limitations of the SCAs and the Settlement Agreement.  Finally, the parties made clear both the extensions of the 2010–2012 SCAs and the forthcoming 2013 SCA were bargained-for benefits of the Settlement, confirming at the Final Approval Hearing that these benefits would be available only to those who had not opted out of the Settlement Class.

The Court has extensively considered the objections, which were invaluable in directing the Court's inquiry during the Final Approval Hearing.  The oral argument of the Represented Objectors was similarly helpful, ensuring that the Final Approval Hearing was adversarial and exhaustive, and that all in attendance were fully heard.  The parties agreed, as a result of discussions during the hearing, to revise the notice forms to specifically apprise Class Members of the opportunity to be reimbursed for any necessary repairs caused exclusively by the oil consumption defect, and further, to allow any who had previously opted out of the Settlement on the understanding that such expenses were not covered to return to the Class.  This gesture

underscores the parties' responsiveness to the objections of Class Members and efforts ensure those entitled to reimbursement receive it.

### e.  Stage of Proceedings

The Court considers the progress of litigation at the time of settlement to ensure that the parties "had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation." *Saccoccio*, 297 F.R.D. at 694 (quoting *Lipuma,* 406 F. Supp. 2d at 1324).

The parties reached the Settlement relatively early in this case, before GM filed an answer or responsive motion.  However, the record was sufficiently developed to enable the parties to make a reasoned and informed judgment regarding the Settlement.  The parties had access to discovery, and *Hindsman* had proceeded to a ruling on GM's motion to dismiss.  Further, the Settlement here was informed by expert analysis and inspections of several Class Vehicles, and by discussions with the mediator regarding each party's factual and legal theories.

Having considered the complaint, the parties' briefing on approval of the settlement, the objections, and oral argument at the Final Approval Hearing, the Court concludes that the Settlement is a fair, adequate, and reasonable resolution of the dispute, and the Settlement is therefore approved.

## V.    THE SETTLEMENT CLASS IS PROPERLY CERTIFIED.

The Court entered an Order finding Rule 23 certification appropriate for preliminary approval on May 2, 2018.  DE 29 ¶¶ 1 to 4.  Having considered the entirety of the record, and particularly the Motion for Preliminary for Approval, DE 27, and Motion for Final Approval of Class Action Settlement, DE 120, the Court approves the certification of the Settlement Class and the designation of Class Counsel and the Class Representatives under Rule 23.

There are "four threshold requirements of Rule 23(a): (1) the class must be so numerous that joinder of all members is impracticable ('numerosity'); (2) questions of law or fact common to the class must exist ('commonality'); (3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class ('typicality'); and (4) the representative parties must fairly and adequately protect the interests of the class ('adequacy of representation')." *Leszczynski v. Allianz Ins.*, 176 F.R.D. 659, 668 (S.D. Fla. 1997). Further, the movant must show that the case can proceed as a class action under subparts (1), (2), and/or (3) of Rule 23(b). *Fabricant v. Sears Roebuck & Co.*, 202 F.R.D. 310, 313 (S.D. Fla. 2001). As discussed below, each of the Rule 23(a) and Rule 23(b) requirements are satisfied here.

### A.     The Rule 23(a) Requirements are Satisfied

#### 1.     Numerosity

The first prerequisite of class certification is that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). No specific number is required to satisfy numerosity. However, fewer than twenty-one members is generally inadequate. *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986). Here, the Court finds that the Settlement Class of more than 1.6 million individuals makes joinder of all such persons impracticable, and the numerosity requirement is thus satisfied.

#### 2.     Commonality

The second prerequisite of class certification is that "there are questions of law or fact common to the class." Fed. R. Civ. P. Rule 23(a)(2). The "threshold for commonality is not high." *Campos v. INS*, 188 F.R.D. 656, 659 (S.D. Fla. 1999). The "Plaintiffs' legal claims need not be completely identical and factual differences concerning treatment [by Defendant] or damages will

not defeat a finding of commonality." *Brown v. SCI Funeral Servs. of Fla., Inc.,* 212 F.R.D. 602, 604 (S.D. Fla. 2003).

Here, Plaintiffs' allegations arise from the same common nucleus of operative facts, and all members of the proposed Settlement Class will rely upon the same common evidence to prove their claims. The common issues include: whether the Class Vehicles contain common defective parts, whether GM harmed consumers by breaching its uniform implied and express warranties by selling defective Class Vehicles, and whether GM engaged in any deceptive conduct with respect to the oil consumption defect. The commonality requirement is thus satisfied.

### 3.      Typicality

The third prerequisite to class certification is the typicality requirement. Fed. R. Civ. P. 23(a)(3). To satisfy the typicality requirement, "[c]lass members' claims need not be identical . . . rather, there need only exist a sufficient nexus between the legal claims of the named class representatives and those of individual class members to warrant class certification." *Ault v. Walt Disney World Co.*, 692 F.3d 1212, 1216 (11th Cir. 2012) (internal citations omitted).

Plaintiff Berman's claims arise from the same defective piston rings at issue in the Class Vehicles' engines, and from the same legal theories as the Settlement Class Members' claims. Plaintiff Ellen Berman purchased a new 2012 Chevrolet Equinox from a dealership on June 3, 2012. DE 1 ¶ 43. She alleges that she experienced the oil consumption defect beginning in 2017 while within the parameters of the 2012 SCA, and that her engine has suffered damage evidenced by spark knocking, causing damage to internal engine components. DE 1 ¶¶ 45–46. She further alleges that staff at the dealership failed to alert her to the problem through its oil consumption testing. *Id.* Although Plaintiff owns only a model year 2012 Class Vehicle, all of the models of Class Vehicles contain similar allegedly defective piston rings. Therefore, the Court finds that

there is a sufficient nexus between Plaintiff Berman's claims of engine damage due to the oil consumption defect and the claims of Settlement Class Members, and the typicality requirement is satisfied.

### 4.   Adequacy

The fourth and final prerequisite under Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P.23(a)(4).  This inquiry has two components: (1) "the representatives must not possess interests which are antagonistic to the interests of the class," and (2) "the representatives' counsel must be qualified, experienced and generally able to conduct the proposed litigation."  *CV Reit, Inc. v. Levy*, 144 F.R.D. 690, 698 (S.D. Fla. 1992) (citation omitted).  Adequacy of representation is usually presumed in the absence of evidence to the contrary.  *Access Now, Inc. v. AHM CGH, Inc.*, No. 983004, 2000 WL 1809979, at *4 (S.D. Fla. 2000) (citation omitted).

Here, the proposed Class Representatives in this action and the Related Actions purchased Class Vehicles containing allegedly defective parts and thus allegedly suffered injury or loss. There is no indication that any of the proposed Class Representatives has an interest that is antagonistic to the claims of any Settlement Class Member.  Likewise, Class Counsel have vigorously represented the Class Representatives and putative Class Members in this action and the Related Actions.  Therefore, the Court finds that both Class Representatives and Class Counsel will fairly and adequately represent the Settlement Class.

### B.   The Requirements of Rule 23(b)(3) are Satisfied

In addition to meeting the requirements of Rule 23(a), the movant must show that the case can proceed as a class action under subparts (1), (2), and/or (3) of Rule 23(b).  *Fabricant,* 202 F.R.D. at 313 (citation omitted).  The Settlement here is appropriate for certification under Rule

23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."   Fed. R. Civ. P. 23(b)(3).

### 1.   Common Questions Predominate

The predominance element of Rule 23(b)(3) requires that "[c]ommon issues of fact and law . . . 'ha[ve] a direct impact on every class member's effort to establish liability that is more substantial than the impact of the individualized issues in resolving the claim or claims of each class member.'"  *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1170 (11th Cir. 2010) (emphasis and citation omitted).  Predominance "'does not require that all issues be common to all parties,' rather, it mandates that 'resolution of the common questions affect all or a substantial number of the class members.'"  *In re Tri-State Crematory Litig.*, 215 F.R.D. 660, 692 (N.D. Ga. 2003) (quoting *Watson v. Shell Oil Co.*, 979 F.2d 1014, 1022 (5th Cir. 1992)).  Moreover, that this matter involves state laws from multiple jurisdictions does not undermine certification of the Settlement Class.  *See Burrow v. Forjas Taurus S.A.,* No. 16-cv-21606, 2019 U.S. Dist. LEXIS 63893, at *22–23 (S.D. Fla. Mar. 15, 2019) (noting that "choice-of-law analyses may have presented manageability problems in resolving claims in contested class and litigation proceedings, [but] it is not a factor in the nationwide settlement context") (citing *Sullivan v. DB Inv., Inc.*, 667 F.3d 273, 297 (3d. Cir. 2011) (en banc)).

The predominance requirement is satisfied because questions common to all Settlement Class Members substantially outweigh any possible issues that are individual to each Settlement Class Member.  The evidence necessary to establish Plaintiffs' claims are common to all the Class Representatives and all members of the Class; they would all seek to prove that the Class Vehicles

suffer from the oil consumption defect and that GM breached express and implied warranties with respect to the Class Vehicles.  See *Brown v. Electrolux Home Prod., Inc.*, 817 F.3d 1225, 1235 (11th Cir. 2016) ("[I]f common issues truly predominate over individualized issues in a lawsuit, then the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered.") (quoting *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1270 (11th Cir. 2009)) (alteration in original).

### 2.   Class Treatment of Plaintiffs' Claims Is Superior

The second prong of Rule 23(b)(3) requires courts to determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Sacred Heart Health*, 601 F.3d at 1183 (citing Fed. R. Civ. P. 23(b)(3)).  The focus of the analysis is on "the relative advantages of a class action suit over whether other forms of litigation might be realistically available to the plaintiffs." *Id.* (quoting *Klay v. Humana, Inc.*, 382 F.3d 1241, 1269 (11th Cir. 2004)).

The Court finds that a class action is the superior method for adjudicating Plaintiffs' and Settlement Class Members' claims. Here, individual Settlement Class Members have little incentive to control the prosecution of separate individual actions because the time and expense associated with such litigation would easily exceed the potential individual recovery.  "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (citing *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997).  Each individual Class Member's damages—the cost of repairing engine damage caused by the oil consumption defect or of replacing the piston assembly—is too small to warrant individuals taking on the cost and burden of litigating against a

large corporate defendant like GM.  Thus, resolution of all claims in one action is superior to individual actions and permits an efficient adjudication.

> **C.** **The Class Is Ascertainable**

In addition to satisfying the requirements of Rule 23, a Rule 23(b)(3) class must also be ascertainable before it may be certified.  *See Karhu v. Vital Pharms., Inc.*, 621 Fed. Appx. 945, 946 (11th Cir. 2015).  A class is ascertainable if it can be identified in an "administratively feasible" manner.  *Id.* at 948.  Here, the proposed Class is defined to include all persons who purchased or leased a Class Vehicle in the United States.  By tracing the Class Vehicles' Vehicle Identification Numbers, the parties were able to identify the Class Members for the purpose of notice, DE 120-7, and the Court concludes that it is administratively feasible to identify the Class for certification purposes in a similar manner.  Therefore, the Court finds the Settlement Class is ascertainable.

## VI.   SERVICE AWARDS

The Court grants Class Representatives Ellen Berman, Patrick Sanchez, Mark Stauber and Sally Stauber, Jacob Ross-Demmin, Jennifer Herrington, Ryan Hindsman, Robin Peterson, Diana Miranda, Vanessa Maryanski, Rene Mitchell, and Brittany Chambers a service payment of $4,500.00 each for his or her services as Class Representative.  Although Berman is the only Class Representative named as a Plaintiff in this action, this Settlement resolves all Related Actions and was achieved through the efforts of Class Representatives across all Related Actions.  The Court finds the service payment of $4,500.00 for each Class Representative to be appropriate, fair, and reasonable.  This amount is being paid by Defendant General Motors separately from the funds made available to Class Members pursuant to the Settlement Agreement.

## VII.   ATTORNEYS' FEES AND COSTS

Class Counsel seeks an order which (i) awards Class Counsel attorneys' fees in the amount of $3,390,351, which represents approximately 8 percent of the estimated minimum value of the settlement value, including notice and administration costs,[7] and (ii) grants reimbursement of litigation expenses in the amount of $109,649.

In the Eleventh Circuit, "it is well established that when a representative party has conferred a substantial benefit upon a class, counsel is entitled to attorneys' fees based upon the benefit obtained." *Gevaerts v. TD Bank, N.A.*, No. 14-cv-20744, 2015 WL 6751061, at *10 (S.D. Fla. Nov. 5, 2015) (citing *Camden I Condo Ass'n v. Dunkle*, 946 F.2d 768, 771 (11th Cir. 1991) [*Camden I*]).  In *Camden I*, the Eleventh Circuit held that "the percentage of the fund approach [as opposed to the lodestar approach] is the better reasoned in a common fund case.  Henceforth in this Circuit, attorneys' fees awarded from a common fund shall be based upon a reasonable percentage of the fund established for the benefit of the class." *Id.* (quoting *Camden I*, 946 F.2d at 774).  The Eleventh Circuit has applied this percentage-based approach to "claims-made settlements," noting that a "claims-made settlement is . . . the functional equivalent of a common fund settlement where the unclaimed funds revert to the defendant." *Poertner v. Gillette Co.*, 618 Fed. Appx. 624, 628 n.2 (11th Cir. 2015).

Courts have "substantial discretion in determining the appropriate fee percentage awarded to counsel." *Gavaerts*, 2015 WL 6751061, at *10. "There is no hard and fast rule mandating a certain percentage of a common fund which may be awarded as a fee because the amount of any fee must be determined upon the facts of each case." *Id.* (quoting *In re Sunbeam Sec. Litig.*, 176

---

[7] In assessing attorneys' fees, the Court relies on the parties' estimated value of the 2013 SCA—$40 million—and the notice and administration costs of approximately $2.3 million, for a total value of $42.3 million. DE 121.  The Court notes that 8 percent is likely an overestimate of the proportion of attorneys' fees because it does not account for the value of reopening the 2010–2012 SCAs, which did not lend itself to precise calculation.

F. Supp. 2d 1323, 1333 (S.D. Fla. 2001)).  As a general rule "'[t]he majority of common fund fee awards fall between 20 percent to 30 percent of the fund,' although 'an upper limit of 50 percent of the fund may be stated as a general rule.'"  *Id.* (quoting *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1333 (S.D. Fla. 2001)).

Moreover, in *Camden I*, the Eleventh Circuit instructed courts to further evaluate common fund awards based on reasonableness factors set out in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974) (the "*Johnson* factors").  The *Johnson* factors include: "(1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and the length of the professional relationship with the client; and (12) awards in similar cases."  *Camden I*, 946 F.2d at 772 n.3.  The total attorneys' fees of approximately $3.3 million is reasonable in light of the *Johnson* factors.

### 1.  The Time and Labor Required, Preclusion from Other Employment and the Time Limits Imposed Justify the Fee Amount

The first, fourth, and seventh *Johnson* factors—the time and labor, preclusion of other employment, and time limitations imposed—each support the reasonableness of Class Counsel's fees.  Class Counsel was continuously engaged in litigation across all three Related Actions, since prior to filing the *Hindsman* complaint in September 2017 through the present.  The litigation has entailed investigative work, motion practice, extensive fact discovery, attending GM's inspections of various proposed Class Representatives' vehicles, engaging expert witnesses, attending mediation, and subsequent negotiations.  It is reasonable to conclude that this volume of work

limited Class Counsel's bandwidth for other engagements. *See Yates v. Mobile Cty. Pers. Bd.*, 719 F.2d 1530, 1535 (11th Cir. 1983) (the expenditure of time "necessarily had some adverse impact upon the ability of counsel for plaintiff to accept other work, and this factor should raise the amount of the award").

### 2. The Case Involved Complex Issues with a High Risk of Nonpayment

The second, sixth and tenth *Johnson* factors—the novelty and difficulty of the questions, the contingent nature of the case, and the undesirability of the case—also support the requested fee award. As discussed, Plaintiffs' claims faced several obstacles on the merits. Class Counsel proceeded to litigate this claim on a contingency basis, despite GM's likely defenses, and obtained a settlement. GM's likely defenses made the litigation a high-risk endeavor, and Class Counsel's willingness to assume such risk makes a reasonable premium appropriate.

### 3. Class Counsel Achieved a Favorable Result for the Settlement Class

The eighth *Johnson* factor focuses on the results achieved for the Class. Relative to the risks of litigation, this Settlement represents a favorable result for the Class, discussed in Part IV.2.b, *supra*. The estimated value of the Settlement, including notice and administration costs, is at least $42 million. Moreover, the amount of the Settlement is uncapped; thus, the actual payments to Class Members could exceed this amount and each Class Member's recovery would not be reduced.

### 4. The Requested Fee Amount is Reasonable Relative to Similar Class Cases and Is Separate from the Funds Made Available to the Class

The fifth and twelfth *Johnson* factors—the customary fee, and awards in similar cases—also support approval. A fee amounting to 8 percent of the estimated value of benefits obtained for the class is low relative to other fee awards in the Eleventh Circuit. *See, e.g., Nelson v. Mead Johnson & Johnson Co.*, 484 Fed. Appx. 429, 435 (11th Cir. 2012) (upholding fee award of 25

percent of common fund in claims-made settlement in which defendant agreed to send claimants free baby formula up to a certain aggregate value).

### 5.   The Skill, Experience, Reputation, and Ability of Class Counsel

The remaining *Johnson* factors—the skill required to perform the legal services properly and the experience, reputation, ability of the attorneys, and the nature of the professional relationship with the clients—confirm that the fees sought are reasonable.  Each of the three Class Counsel has significant experience litigating complex class actions.  DE 121-1, 121-2, 121-3.

Only two objections discussed the amount of attorneys' fees in depth.  DE 47, 80.  Both argue that the attorneys' fees are unjustified on the basis that the Class does not meaningfully benefit from the Settlement.  As discussed, the Court respectfully disagrees with that conclusion in light of the risks of litigation.

For the foregoing reasons, the Court grants Class Counsel's application for fees in the amount of $3,390,351.00 and for costs in the amount of $109,649.00, to be paid by GM separately from the funds made available to Class Members pursuant to the Settlement Agreement.

## VIII.   CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED:**

1.     Plaintiffs' Motion for Final Approval of Class Action Settlement [DE 120] is **GRANTED**.

2.     The Settlement Agreement [DE 27-1] is **APPROVED**, with the parties' supplemented Notice and Claim Forms [DE 159-1, DE 159-2, DE 159-3] and subject to the mailing of Notices to Opt-Outs [DE 159-4, DE 159-5].  The Court finds that the Settlement Agreement constitutes, in all respects, a fair, adequate and reasonable settlement as to all Settlement Class Members in accordance with Rule 23 of the Federal Rules of Civil Procedure, and directs its

consummation pursuant to its terms and conditions. Further, the class definition is sufficiently ascertainable such that an individual can ascertain whether he or she is in the Settlement Class based on objective criteria.

3.      The Court finds and concludes that the Settlement Class Notice and procedures set forth in the Settlement Agreement satisfy Rule 23 of the Federal Rules of Civil Procedure and the requirements of due process, were the best notice practicable under the circumstances, and support the Court's exercise of jurisdiction over the Settlement Class as contemplated in the Settlement and this Order.  The Court finds and concludes that the notice provided by GM to the appropriate State and federal officials pursuant to 28 U.S.C. § 1715 satisfied the requirements of that statute.

4.      The Court orders that the individuals listed in Exhibit C of the Declaration of Richard Simmons [DE 120-7] are excluded from the Settlement Class, unless they submit a Claim Form on or before the Claim Deadline.  Those individuals listed in Exhibit C of the Declaration of Richard Simmons [DE 120-7] and who do not submit a Claim Form prior to the Claim Deadline will not be bound by the Settlement Agreement, and neither will they be entitled to any of its benefits.

5.      Plaintiffs and each and every one of the Settlement Class Members who have not requested exclusion from the Settlement Class, hereby unconditionally, fully, and finally release and forever discharge the Released Parties from the Released Claims.  Each and every Settlement Class Member, and any person actually or purportedly acting on behalf of any Settlement Class Member(s), is hereby barred from commencing, instituting, continuing, pursuing, maintaining, prosecuting, or enforcing any Released Claims (including, without limitation, in any individual, class or putative class, representative or other action or proceeding), directly or indirectly, in any judicial, administrative, arbitral, or other forum, against the Released Parties.

6. The Court finds that the Settlement Class Members have been adequately represented by the Class Representatives and Class Counsel, and that the relief provided is fair, adequate, and reasonable, considering the costs, risks, and delay of trial and appeal, the effectiveness of the proposed method of distributing relief and method of processing claims, and all other relevant factors, and that the Settlement treats Class Members equitably relative to each other.

7. If for any reason the Settlement terminates, then certification of the Settlement Class shall be deemed vacated. In such an event, the certification of the Settlement Class for settlement purposes or any briefing or materials submitted seeking certification of the Settlement Class shall not be considered in connection with any subsequent class certification issues, and the parties shall return to the status quo ante in the action, without prejudice to the right of any of the parties to assert any right or position that could have been asserted if the Settlement had never been reached or proposed to the Court.

8. The objections to the Settlement and to the application by Class Counsel for attorneys' fees and expenses, and the objections to the application by Class Counsel and Class Representatives for Service Payments have been reviewed by the Court and are overruled.

9. Plaintiffs' Motion for Attorney's Fees and Expenses, Class Representative Service Payments [DE 121] is **GRANTED.**

10. This case is **DISMISSED WITH PREJUDICE.**

11. The Court retains jurisdiction over this action for a period of 180 days after the Effective Date for the limited purposes of (i) appointing a referee pursuant to paragraph 63 of the Settlement Agreement, and (ii) resolving disputes between the parties regarding the retention of the Settlement Administrator pursuant to paragraph 69 of the Settlement Agreement.

12.     The Clerk of the Court is directed to **CLOSE THIS CASE.**  All pending deadlines

are **TERMINATED** and all motions are **DENIED AS MOOT.**

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 15th day of

November, 2019.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to Counsel of Record